**WO**                                                                                          JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ramon Luis Mendoza, | No. CV 21-00829-PHX-MTL (DMF) |
| Plaintiff, | |
| vs. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Ramon Luis Mendoza, who is confined in the Arizona State Prison Complex (ASPC)-Lewis, Buckley Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against multiple Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) officials. (Doc. 1.) Before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 72.)[1] The Court will deny Plaintiff's Motion.

**I.     Background**

Plaintiff's claims arose when he was transferred from close custody confinement to the ASPC-Eyman, Browning Unit, which is a maximum custody facility. (Doc. 6 ¶ 1.) Plaintiff alleged that confinement in the Browning Unit imposes an atypical and significant hardship in relation to the ordinary incidents of prison life due to extreme conditions. (*Id.* ¶¶ 45–50.)

---

[1] Also before the Court is Defendants' Motion for Summary Judgment (Doc. 77), which will be addressed by a separate order.

Plaintiff stated that, previously, he had a security threat group (STG) maximum custody assignment, which resulted in ineligibility for early release, good time, or other credits unless he renounced or successfully completed ADCRR's Step-Down Program. (*Id.* ¶ 56.) Plaintiff asserted that he successfully completed the Step-Down Program, left the Browning Unit as an "inactive" STG member, and was placed in close custody confinement in March 2018. (*Id.* ¶¶ 3, 40.)

Plaintiff alleged that, on January 23, 2021, without any valid explanation, his status as an "inactive" STG member was revoked, he was removed from the Step-Down Program, he was "remanded/transferred" to the Browning Unit, and he was designated as an "active" STG member. (*Id.* ¶¶ 1–2, 5–6.) Plaintiff alleged that, prior to this transfer, he did not receive any proper notice, a hearing, or an opportunity to be heard. (*Id.* ¶¶ 1, 5, 16.)

In Count One of his Complaint, Plaintiff alleged that he was denied due process in violation of the Fourteenth Amendment when he was moved to the Browning Unit in January 2021, that he was subjected to conditions of confinement that constitute an atypical and significant hardship, and that he was denied any meaningful review of his classification and his continued confinement in the Browning Unit. (*Id.* ¶¶ 29, 37.) He alleged that the denial of due process resulted from policies and practices approved and implemented by Defendant Shinn. (*Id.* ¶¶ 35–36.) Plaintiff further alleged that Defendants Warden W. Hensley, Regional Operations Director Kevin Curran, SSU Supervisor Carlos Reyna, Supervisor Lance Uehling, Lieutenant Steve Young, Correctional Officer (CO) David Lewis, Deputy Warden Panann Days, Classification Administrator Evangelina C. Flores, Offender Service Bureau Administrator Stacy Crabtree, Associate Deputy Warden Orin Romney, and CO DeLaCruz are liable based on their roles in authorizing, ratifying, and acquiescing in the actions that led to the violation of his due process rights. (*Id.* ¶¶ 13, 15, 18–20, 22–25, 28, 40.)

In Count Two, Plaintiff alleged that the inhumane conditions of confinement in the Browning Unit constitute cruel and unusual punishment in violation of the Eighth Amendment. (*Id.* ¶¶ 42, 54, 57, 60, 67.)

On screening, the Court determined that, in Count One, Plaintiff sufficiently stated a Fourteenth Amendment due process claim against Shinn in his official capacity and against the other named Defendants in their individual capacities based on their roles in Plaintiff's January 2021 transfer back to the Browning Unit. (Doc. 8 at 11.) The Court also determined that, in Count Two, Plaintiff sufficiently stated an Eighth Amendment conditions-of-confinement claim against Shinn in his official capacity. (*Id.* at 11–12.)

On August 19, 2022, Plaintiff filed the pending Motion for Emergency Temporary Restraining Order and Preliminary Injunction.[2] (Doc. 72.) Plaintiff seeks to enjoin Defendants from enforcing, at the time of filing, an upcoming ex post facto revocation hearing scheduled for August 24, 2022, and he seeks to enjoin Defendants from enforcing that part of ADCRR Department Order 806, amended in April 2021, that relates to STG validations and classifications and Step-Down status, removals, and revocations. (*Id.*)

**II.   Preliminary Injunction Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.

---

[2] The Motion will be construed as a Motion for Preliminary Injunction, only, because the August 24, 2022, revocation hearing has passed.

- 3 -

*Winter*, 555 U.S. at 20. When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

Further, under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**III.   Relevant Facts**

If a prisoner is validated as an STG member, he is assigned to "maximum security-validated segregation," or maximum custody, which is highly restrictive, with conditions including extreme isolation; deprivation of environmental or sensory stimuli; confinement in constantly illuminated 8' by 10' windowless concrete cells; limited calories and all meals in cells; no physical contact; no contact visits; restricted recreation; minimal programming; and strip searches upon any cell movement. (Doc. 72-1 at 5, Pl. Decl. ¶¶ 5–14; Doc. 5 ¶¶ 45–50.)

After a prisoner has been validated as an STG member, the prisoner may remove the STG validation or status either by debriefing and renouncing membership, or by successfully completing the Step-Down Program. (*Id.* ¶¶ 15, 16; *see* Doc. 72-1 at 58–59.)

Plaintiff asserts that renouncing comes with a risk of reprisals, and it does not guarantee that the prisoner renouncing will be released from maximum custody or have the STG status removed. (Doc. 72-1 at 5, Pl. Decl. ¶ 17.) Plaintiff states that prisoners who renounce and are reviewed remain in maximum custody. (*Id.*)

In 2012, Plaintiff was validated as an STG member. (Doc. 78 at 4.) In November 2016, Plaintiff was enrolled in the Step-Down Program, which consists of three phases, each phase lasting 180 days. (Doc. 72-1 at 5 ¶ 19, *see* Doc. 71-1 at 60.) According to Department Order 806, which governs STGs, upon completion of the 18-month Step-Down Program, a prisoner may be eligible for transfer out of maximum custody and moved to a designated close custody general population unit. (Doc. 72-1 at 5–6, Pl. Decl. ¶ 20, *see* Doc. 71-1 at 62.) A prisoner is eligible to reintegrate into close custody when he successfully completes the Step-Down Program, and his behavior demonstrates that he does not pose a threat to staff, prisoners, or the safe and secure operations of the prison. (Doc. 78 at 3.) If a prisoner successfully completes the 18-month program and passes a polygraph, he is eligible for close custody. (*Id.*)

In March 2018, Plaintiff successfully completed the Step-Down Process and passed a polygraph examination. (Doc. 72-1 at 6, Pl. Decl. ¶¶ 21–22.) It was determined that he was eligible for classification/custody reduction, and he was released from maximum custody. (*Id.*) Plaintiff was transferred to a transitional program—Phase IV of the Step-Down Program—at a close custody facility for four weeks, after which his status was modified to "completed." (*Id.* ¶¶ 23–24.) He was then restored to pre-STG status and permitted, among other benefits, time credits; double cell living; contact food visits; programing; and better medical, food, and recreation. (*Id.* ¶ 25.) Phase V of the Step-Down Program is an indefinite period of monitoring for Step-Down prisoners. (Doc. 78 at 3.)

Plaintiff was housed at this status and received the above privileges for approximately three years, until January 23, 2021, when he was suddenly transferred back to maximum custody at the Browning Unit. (Doc. 72-1 at 6, Pl. Decl. ¶ 26.)

On January 21, 2021, Plaintiff had been disciplined for threatening or intimidating

staff, and, on January 23, 2021, Plaintiff had been disciplined for possessing a prohibited communications device. (Doc. 78 at 5, Exs. 2–3.) Defendant Lieutenant Young recommended that Plaintiff be removed from the Step-Down Program based on these violations, and Defendants Investigative Manager Williams and Regional Operations Director Curran agreed with the recommendation. (*Id.*; Doc. 72-1 at 36, Resp. to Interrog. No. 2.) Defendant Uehling signed off on the removal on behalf of Defendant Williams. (*Id.*)

On February 8, 2021, Plaintiff filed an Inmate Letter to the Central Office complaining that he was assigned to maximum custody without any notice and without a hearing at which to defend against the reasons for revoking his Step-Down status. (Doc. 78-7 at 11–12.)

On February 13, 2021, a maximum custody review hearing was held. (Doc. 78-7 at 7.) Plaintiff waived his right to the 48-hour notice of the hearing. (*Id.* at 9.) At the hearing, it was recommended that Plaintiff stay in maximum custody due to his STG validation and because he had recently received two major infractions. (*Id.* at 7.) The form documenting the February 13, 2021, hearing noted that Plaintiff's status as a Step-Down prisoner had been revoked because he received two major violations. (*Id.* at 6.) Plaintiff was notified of the appeal process, and it was documented that he did not waive his right to appeal the decision. (*Id.*)

On March 15, 2021, Defendant Uehling pulled Plaintiff out of his cell and advised Plaintiff that he would not be receiving any revocation notice or hearing pursuant to a new version of DO 806 that would be in effect April 15, 2021. (Doc. 5 at 10.) Although the new policy was not yet in effect, Defendant Uehling told Plaintiff he was authorized to apply the new policy rather than the previous and still existing policy, which required certain procedural safeguards—such as a 10-day notice and a hearing—prior to removal from the Step-Down Program. (*Id.*)

Plaintiff appealed his placement in maximum custody. (Doc. 78-8 at 2.) On March 26, 2021, Defendant Crabtree, the Offender Services Bureau Administrator, issued the

appeal response, informing Plaintiff that he was correctly classified to maximum custody based on Plaintiff's scoring and prior validation as an STG member. (*Id.* at 3.)

Plaintiff filed this action in May 2021. (Doc. 6.)

Meanwhile, Plaintiff asserts that, after his January 2021 transfer to maximum custody, he was "forced" to renounce and debrief. (Doc. 75 at 6.) Although he has participated in the debriefing program, Plaintiff is still designated as an STG member and subject to heightened STG status-based classification. (*Id.*)

Defendant Towles, Deputy Security Operations Administrator, avers that, during litigation of this lawsuit, he determined that Plaintiff "should be provided a hearing pursuant to the version of DO 806 in effect in January 2021 because [Plaintiff] was removed according to the April 2021 version of DO 806 before that version became official." (Doc. 78-1 at 8, Towles Decl. ¶¶ 33, 43.)

In January 2021, the relevant version of DO 806 provided that a prisoner may be removed from Phases IV or V of the Step-Down Program if it is confirmed that the prisoner violated certain listed criteria. (Doc. 78-1 at 25, DO 806 § 11.2.) However, any recommendation for removal had to be forwarded to the Security Operations Administrator with supporting documentation, and the SSU Coordinator had to deliver to the prisoner, at least ten business days prior to a hearing, the Hearing Notification/Step-Down Revocation form to enable the prisoner time to prepare a defense. (*Id.*, DO 806 §§ 11.3, 11.4.) The STG Validation Hearing Committee then had full discretion to determine whether the prisoner was to be removed from the Step-Down Program or returned to an earlier phase in the Program. (*Id.*, DO 806 § 11.6.) Prisoners were permitted to appeal the decision of the STG Validation Hearing Committee. (*Id.*, DO 806 §§ 11.5, 11.9.)

In April 2021, DO 806 was amended to remove any provision providing for notice or a hearing for prisoners removed from the Step-Down Program. The relevant portion of amended DO 806 states:

> Inmates who are removed from the Step-Down Program, due to direct involvement in STG activity or for any reason deemed

> appropriate by the respective Regional Operations Director, Investigative Manager, or Assistant Director for Prison Operations, during the inmate's placement in the program shall be required to serve a minimum of two years in Maximum Custody before they are eligible to participate in the program.

(DO 806 § 9.2 (effective date April 15, 2021).)[3]

On August 8, 2022, 19 months after he was removed from the Step-Down Program, Plaintiff was served with a "Hearing Notification/STG Step-Down Revocation Hearing" form, which informed Plaintiff that he was being removed from the Step-Down Program based on three letters discovered in August, September, and November of 2019. (Doc. 72-1 at 75.) The form indicated that a hearing was scheduled for August 24, 2022. (*Id.*)

On August 19, 2022, Plaintiff filed his pending Motion for Preliminary Injunction, seeking to enjoin enforcement of the upcoming August 24, 2022, hearing and to enjoin enforcement of that part of DO 806 related to "STG Validations; Validated Classifications; Maximum Security Confinements/Placements; Step-Down Completed Status (Close Custody) Removals, Revocations, and Revalidations." (Doc. 72 at 1.)

On August 24, 2022, an STG Revocation hearing was conducted pursuant to the previous version of DO 806—that is, pursuant to the version that had been in effect in January 2021. (Doc. 73 at 2[4]; Doc. 75 at 3.) The Hearing Committee determined that there was insufficient evidence to justify revocation of Plaintiff's inactive/completed status. (Doc. 75 at 3.) After the hearing, Defendant Reyna decided against placing Plaintiff back into the Step-Down Program purportedly because, since Plaintiff has debriefed and is housed in protective custody, his safety would be in jeopardy if he were to be placed back

---

[3] *See* DO 806, Security Threat Groups (STGs), https://corrections.az.gov/sites/default/files/documents/policies/800/0806.pdf (last visited Feb. 13, 2023).

[4] In their Response, Defendants cite to "Exhibit A (Result of STG Step-Down Revocation hearing, dated August 24, 2022)"; however, there are no exhibits attached to Defendants' Response. (*See* Doc. 73.) Regardless, the parties agree that the hearing was held on August 24, 2022, and that the Hearing Committee determined that Plaintiff should not be removed or revoked from the Step-Down Program. (*Id.* at 2; Doc. 75 at 3.)

- 8 -

in the Step-Down Program. (*Id.*)[5]

## IV. Discussion

Plaintiff filed his Motion for Preliminary Injunction a week before the scheduled August 24, 2022, revocation hearing. (Doc. 72.) The hearing was held before the Court ruled on Plaintiff's Motion. Therefore, to the extent that Plaintiff sought an injunction to stop the hearing, his request is moot.

Although Plaintiff alleged that the August 24, 2022, hearing would be improper, highly prejudicial, and meaningless, the Hearing Committee found in Plaintiff's favor and determined that Plaintiff should not be removed from the Step-Down Program or transferred to maximum custody. (*Id.* at 4.) Thus, to the extent that Plaintiff anticipated a decision against him, and sought to enjoin enforcement of such a decision, his request for relief is moot.

Plaintiff's remaining request for relief seeks to bar enforcement of provisions within the amended version of DO 806 that pertain to STG classification, maximum custody placements, and Step-Down Program revocations and removals.

### A. Likelihood of Success on the Merits

#### 1. Fourteenth Amendment Due Process Standard

The Supreme Court has explained that although "prisoners do not shed all constitutional rights at the prison gate," "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Sandin v. Conner*, 515 U.S. 472, 485 (1995) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). Thus, only some placements implicate due process and require notice and an opportunity to be heard and non-adversarial review of the evidence supporting the placement.

In *Sandin*, the Supreme Court rejected the argument that any state action taken for

---

[5] Defendants assert that the Hearing Committee made the decision that Plaintiff could not return to the Step-Down Program; however, because they failed to attach the form documenting the August 24, 2022, hearing, there is no evidence that the Committee made this decision as opposed to Defendant Reyna, as Plaintiff alleges. (*See* Doc. 73 at 2.)

- 9 -

a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation. *Id.* at 484. Rather, prisoners have liberty interests protected by the Due Process Clause only where the contemplated restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* To determine the existence of atypical and significant hardships, the Court considers "1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (citations omitted).

If the contemplated restraint imposes an atypical and significant hardship on the prisoner, liberty interests are implicated, and the prisoner is entitled to procedural protections. To determine what process is due, a court must apply the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

### 2. Analysis

#### a. Conditions in the Browning Unit

Plaintiff's allegations regarding the conditions in maximum custody, which Defendants do not refute, establish that conditions at the Browning Unit are like those the Supreme Court has held impose an "atypical and significant hardship in the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *Brown*, 751 F.3d

1  at 985, 988 (solitary confinement for over 23 hours a day, 30 minutes of recreation per day, just two non-contact visits, denial of most privileges afforded prisoners in general population, and minimum annual reviews constituted atypical and significant hardship); *Wilkinson*, 545 U.S. at 214, 223–24 (constant illumination in cell, one hour of recreation per day in indoor room, rare opportunities for non-contact visitation, and indefinite placement reviewed just annually constituted an atypical and significant hardship).

The Ninth Circuit has held that a prisoner's "liberty interest in avoiding maximum custody is clearly established." *Johnson v. Ryan*, 55 F.4th 1167, 1197 (9th Cir. 2022). Here, Plaintiff's transfer from close custody to maximum custody in the Browning Unit and its attendant conditions constituted a material change in his living conditions, and he was subject to an atypical and significant hardship. *See id.* at 1198 (finding that the change in the plaintiff's underlying conditions of confinement when he was moved from close custody and returned to maximum custody at the Browning Unit created an atypical and significant hardship). Accordingly, Plaintiff had a liberty interest in avoiding transfer to the Browning Unit.

### b.     Sufficiency of Process

Next, the Court considers the three prongs of the *Mathews* test to determine whether the procedures provided to Plaintiff prior to his January 2021 transfer to the Browning Unit were constitutionally adequate. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

In *Johnson*, the Ninth Circuit explained that, in the context of prison gangs, the private and public interest—the first and third prongs in the *Mathews* analysis—weigh in favor of the government. 55 F.4th at 1181. As to the private interest, any placement in prison is a severely restricted environment; thus, procedural protections are limited compared to "cases where the right at stake is the right to be free from confinement at all." *Id.* (citing *Wilkinson*, 545 U.S. at 225). The government's interest is strong with respect to prison security and order when dealing with gangs; "prisons have a legitimate penological


interest in stopping prison gang activity." *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003); *see Wilkinson*, 545 U.S. at 227 ("in the context of prison management, . . . [the state's] interest is a dominant consideration").

As to the second *Mathews* prong, the court must "consider the risk that under [ADCRR] procedures, [Defendants] will erroneously reassign [Plaintiff] to maximum security." *Johnson*, 55 F.4th at 1199. Supreme Court cases have consistently found that notice of the factual basis leading to consideration for maximum custody placement and "a fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 226.

In *Johnson*, the Ninth Circuit addressed an Arizona prisoner's claim that he was denied due process when he was moved from close custody as part of Phase IV of the Step-Down Program and transferred back to the Browning Unit. 55 F.4th at 1177–78, 1197–99. The plaintiff in *Johnson* received notice of a hearing on his maximum custody placement, and he attended the hearing. *Id.* at 1200. But the appellate court found that the notice did not apprise the plaintiff of the reason for his reassignment to maximum custody, and an insufficient, "bare-bones" explanation for his placement came three months after the hearing. *Id.* at 1200. The Ninth Circuit held that the plaintiff "was not given a meaningful opportunity to learn of the factual basis for his transfer from close custody to maximum custody or to prepare a defense to the accusations." *Id.* The Ninth Circuit concluded that the plaintiff was likely denied due process in the procedures that resulted in his return to maximum custody. *Id.*

Here, Plaintiff was in Phase V of the Step-Down Program and housed in close custody, and then, without explanation, he was transferred to the Browning Unit, a maximum custody facility, without any notice and without any hearing or opportunity for rebuttal. Defendants' provision of a notice and revocation hearing 19 months after Plaintiff's transfer to maximum custody is insufficient to remedy the failure to provide any procedures at the time Plaintiff was transferred. On these facts, Plaintiff establishes a likelihood of success on the merits of his due process claim.

### B.     Irreparable Harm

The movant must demonstrate that absent an injunction, he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Speculative injury is not irreparable injury sufficient for a preliminary injunction. *Id.*; *see Winter*, 555 U.S. at 22.

Plaintiff alleges that the current version of DO 806 will deprive him of due process safeguards because it does not require any notice, hearing, or opportunity to be heard with respect to STG validations and STG-validated confinements. (Doc. 72 at 5–6.) He argues that he was subject to improper revocation for 545 days without any meaningful review or process. (*Id.* at 2, 6.) Plaintiff's statements suggest that he is no longer housed in maximum custody, and the court's docket shows that on August 12, 2022, Plaintiff filed a Notice of Change of Address indicating his move to ASPC-Lewis, Buckley Unit. (Doc. 71.) Plaintiff does not demonstrate that he is likely to be transferred back to maximum custody without sufficient notice and a hearing.

Plaintiff states that, as part of the debriefing program he was forced to participate in to avoid "gulag" confinement, he is considered an STG member and subject to "heightened STG status-based classification." (Doc. 75 at 6.) Again, Plaintiff's statement suggests that he is no longer subject to extreme, gulag-type conditions of confinement, and he does not indicate what the heightened STG status-based classification entails or show that he is currently subject to conditions that expose him to irreparable harm.

For these reasons, Plaintiff cannot show irreparable injury sufficient to support injunctive relief. Accordingly, the Court need not address the remaining *Winter* factors. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (because the plaintiffs failed to show they are likely to suffer irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard).

To the extent Plaintiff seeks a general injunction against enforcement of DO 806 because it no longer includes provisions requiring notice and a hearing prior to a prisoner's

Step-Down Program revocation and transfer to maximum custody, Plaintiff's request will be denied. Prison officials are obligated to comply with Fourteenth Amendment due process requirements, and prisoners are entitled to constitutionally adequate safeguards regardless of whether those safeguards are explicitly set forth in a prison's policy.

Defendants indicate that, because Plaintiff is now debriefing, he is housed in protective custody rather than general population because his safety would be in jeopardy if he were placed back in the Step-Down Program. (Doc. 73 at 3.) Plaintiff's inability to return to the Step-Down Program and close custody general population despite a likely due process violation is concerning; however, Plaintiff fails to propose or request a specific and narrowly drawn remedy for this situation. At the least, Plaintiff's resulting denial of close custody housing options may support a claim for damages.

For the above reasons, Plaintiff's Motion for Preliminary Injunction will be denied.

**IT IS ORDERED** that the reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Preliminary Injunction (Doc. 72), and the Motion is **denied**. To the extent that Plaintiff seeks a temporary restraining order, the Motion is **denied as moot**.

Dated this 21st day of February 2023.

Michael T. Liburdi
United States District Judge