**WO**                                                                                              SM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ramon Luis Mendoza, | No. CV-21-00829-PHX-MTL (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Ramon Luis Mendoza, who is currently confined in Arizona State Prison Complex (ASPC)-Lewis, Barchey Unit, in Buckeye, Arizona,[1] brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 6.) Defendants move for summary judgment, which Plaintiff opposes.[2] (Docs. 77, 85.)

**I.   Background**

Plaintiff's claims arose when he was transferred from close custody confinement to the ASPC-Eyman, Browning Unit, a maximum custody facility. (Doc. 6 ¶ 1.) Plaintiff alleges that confinement in the Browning Unit imposes an atypical and significant hardship in relation to the ordinary incidents of prison life due to extreme conditions. (*Id.* ¶¶ 45–50.)

Plaintiff claims that, previously, he had a security threat group ("STG") maximum custody assignment, which resulted in ineligibility for early release, good time, or other

---

[1] The events underlying Plaintiff's Complaint occurred while Plaintiff was confined at the ASPC-Eyman, Browning Unit.

[2] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 79.)

credits unless he renounced or successfully completed the Arizona Department of Corrections Rehabilitation and Reentry ("ADCRR") Step-Down Program ("SDP"). (*Id.* ¶ 56.) Plaintiff alleges that he successfully completed the SDP, left the Browning Unit as an "inactive" STG member, and was placed in close custody confinement in March 2018. (*Id.* ¶¶ 3, 40.)

Plaintiff alleges that, on January 23, 2021, without any valid explanation, his status as an "inactive" STG member was revoked, he was removed from the SDP, he was "remanded/transferred" to the Browning Unit, and he was designated as an "active" STG member. (*Id.* ¶¶ 1–2, 5–6.) Plaintiff alleges that, prior to this transfer, he did not receive any proper notice, a hearing, or an opportunity to be heard. (*Id.* ¶¶ 1, 5, 16.)

In Count One of his Complaint, Plaintiff alleges that he was denied due process in violation of the Fourteenth Amendment when he was moved to the Browning Unit in January 2021, that he was subjected to conditions of confinement that constitute an atypical and significant hardship, and that he was denied any meaningful review of his classification and his continued confinement in the Browning Unit. (*Id.* ¶¶ 29, 37.) He alleges that the denial of due process resulted from policies and practices approved and implemented by Defendant Shinn. (*Id.* ¶¶ 35–36.) Plaintiff further alleges that Defendants Warden W. Hensley, Regional Operations Director Kevin Curran, SSU Supervisor Carlos Reyna, Supervisor Lance Uehling, Lieutenant Steve Young, Correctional Officer ("CO") David Lewis, Deputy Warden Panann Days, Classification Administrator Evangelina C. Flores, Offender Service Bureau Administrator Stacy Crabtree, Associate Deputy Warden Orin Romney, and CO De La Cruz are liable based on their roles in authorizing, ratifying, and acquiescing in the actions that led to the violation of his due process rights. (*Id.* ¶¶ 13, 15, 18–20, 22–25, 28, 40.)

In Count Two, Plaintiff alleges that the inhumane conditions of confinement in the Browning Unit constitute cruel and unusual punishment in violation of the Eighth Amendment. (*Id.* ¶¶ 42, 54, 57, 60, 67.)

On screening, the Court determined that, in Count One, Plaintiff sufficiently stated

a Fourteenth Amendment Due process claim against Shinn in his individual and official capacities and against the other named Defendants in their individual capacities based on their roles in Plaintiff's January 2021 transfer to the Browning Unit. (Doc. 8 at 11.) The Court also determined that, in Count Two, Plaintiff sufficiently stated an Eighth Amendment conditions-of-confinement claim against Defendant Shinn in his official capacity. (*Id.* at 11–12.)

Defendants now move for summary judgment arguing that Plaintiff received proper due process when he was reassigned to maximum custody, Plaintiff's conditions-of-confinement claim fails as a matter of law because he is no longer housed in the Browning Unit, and that they are entitled to qualified immunity on the due process claim. (Doc. 77.)

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Relevant Facts

In 1991, ADC established a its STG policy dedicated to controlling prison gang activity in Arizona's prisons. (Doc. 78, Defs.' Statement of Facts (DSOF) ¶ 1.) A reduction in prison gang membership and activities contributes to the decrease of violence, intimidation, and harassment of other prisoners. (*Id.*) The purpose of the ADCRR's STG policy is to minimize the threat that prisoner gang or gang-like activity poses to the safe, secure, and orderly operations of institutions. (*Id.* ¶ 2.)

Information is gathered by the Special Security Unit ("SSU") about prisoners suspected of being in an STG. (*Id.* ¶ 3.) When enough information is collected, a validation packet is put together and a hearing is held. (*Id.*) If successfully validated as an STG-member, the validated prisoner is classified as a maximum custody inmate. (*Id.*) Once validated, a prisoner can only have his custody reduced from maximum custody if he renounces his gang membership and debriefs or successfully completes the SDP. (*Id.* ¶ 4.)

If a prisoner is validated as an STG member, he is assigned to "maximum security-validated segregation," or maximum custody, which is highly restrictive, with conditions including extreme isolation; deprivation of environmental or sensory stimuli; confinement in constantly illuminated 8' by 10' windowless concrete cells; limited calories and all meals in cells; no physical contact; no contact visits; restricted recreation; minimal programming; and strip searches upon any cell movement. (Doc. 72-1 at 5, Pl. Decl. ¶¶ 5–14.) Conditions at the Browning Unit "are highly restrictive and designed to foster isolation[.]" (Doc. 86, Pl. Statement of Facts ("PSOF") ¶ 32.) Unlike prisoners housed in general population,

prisoners assigned to the Browning "have virtually every aspect of their lives controlled and monitored" and "are deprived of almost all environmental and sensory stimuli, confined to concrete boxes where they eat all their meals alone." (*Id.*) Prisoners in the Browning Unit "are handcuffed and subjected to strip searches whenever they leave their cells" and their "[r]ecreation is limited to chute-style recreation areas with [20-foot] high concrete walls and no exercise equipment other than a raquet [sic] ball." (*Id.* ¶¶ 32, 33.)

As mentioned, prisoners who are validated and placed in maximum custody can renounce their prison gang membership and provide a debriefing about their gang activities. (DSOF ¶ 5.) Prisoners are permitted to renounce and debrief at any time. (*Id.* ¶ 6.) The SDP is an alternative, indirect way of demonstrating a disassociation with gang activity, but does not require renunciation and debriefing. (*Id.*) Any indication of gang activity will result in removal from the SDP because the absence of gang activity is the primary requirement of remaining in the SDP since the prisoner has refused to renounce his gang membership. (*Id.*)

A validated STG member shall notify ADCRR staff in writing of their desire to participate in the SDP. (*Id.* ¶ 7.) To be eligible, the prisoner shall have successfully completed a 24-month period where they have not participated in any documented STG/gang activity or other behaviors to include, without limitation, assaultive or violent behavior, gang activity, cell phone/communication device violations, drug use or possession, or a major disciplinary violation or more than three minor disciplinary violations within the last six months. (*Id.* ¶ 8.) The prisoner must also successfully complete a polygraph examination that is specific in nature concerning the prisoner's intent of participating in the SDP. (*Id.* ¶ 9.)

Prisoners are screened by the SSU and the STG Unit to determine if they meet criteria to enroll in the SDP. (*Id.* ¶ 10.) A comprehensive investigation of each validated STG prisoner is completed so that ADCRR staff can make an accurate assessment of a prisoner's STG involvement. (*Id.*)

Based on their prior activities, validated STG prisoners must successfully complete the SDP to be eligible to reintegrate into close custody institutions when their behaviors demonstrate that they do not pose a threat to staff, prisoners, or the safe, secure and orderly operations of the institution. (*Id.* ¶ 11.) The SDP review process must be completed within 18 months of the date of the entry into the program. (*Id.* ¶ 12.) According to Department Order ("DO") 806, which governs STGs, if a prisoner successfully completes the 18-month SDP and passes a polygraph (Phase IV), the prisoner then becomes eligible for transfer out of maximum custody and assignment to a designated close custody general population unit. (*Id.* ¶ 13.) After a successful transition to a close custody unit has occurred, SDP graduates begin an indefinite period of monitoring for Step-Down prisoners (Phase V). (*Id.* ¶ 14.)

In January 2021, DO 806 stated that prisoners enrolled in the SDP may be removed from Phases IV or V of the SDP or returned to repeat any phase, upon confirmation that the prisoner has violated any of the criteria outlined in section 8.0, 8.1.2.2.1 through 8.1.2.2.5, and section 9.0, 9.1.1 through 9.1.3. (*Id.* ¶ 15.) All recommendations for the removal of a prisoner from SDP Phases IV or V are forwarded to the Security Operations Administrator or designee and shall include all supporting documentation. (*Id.* ¶ 16.)

The SSU Coordinator must deliver the Hearing Notification/Step-Down Revocation, Form 806-10, to the prisoner at least ten business days prior to the SDP removal hearing to afford the prisoner time to prepare a defense. (*Id.* ¶ 17.) Recommendations for the removal from SDP Phases IV or V shall be approved by the STG Validation Hearing Committee and can be appealed by the prisoner to the STG Appeals Committee. (*Id.* ¶ 18.)

Prisoners who are removed from the SDP, due to direct involvement in STG activity, or for any reason deemed appropriate by the STG Validation Hearing Committee, shall be required to serve a minimum of two years under validated status before they are eligible to participate in the program again. (*Id.* ¶ 19.) Prisoners have two opportunities to participate in the SDP. (*Id.* ¶ 20.) Prisoners who have been removed from the program

twice shall become permanently ineligible from participating in the program and shall remain in validated status unless they choose to participate in the debrief process. (*Id.*)

Plaintiff has been a validated STG member (New Mexican Mafia) since 2012. (*Id.* ¶ 21; PSOF ¶ 30.) Plaintiff unsuccessfully challenged his validation. (PSOF ¶ 30.) As a result of being validated as an STG member, Plaintiff was assigned to the maximum custody Browning Unit. (*Id.* ¶ 31.)

Plaintiff first entered the SDP on November 22, 2016, but he failed the polygraph November 1, 2017, and was recommended for revocation. (DSOF ¶ 22.)

On February 1, 2018, Plaintiff was seen by the Revocation Committee and was reverted to Phase III of the SDP. (*Id.* ¶ 23.) On February 14, 2018, Plaintiff was placed back into Phase III and given another polygraph, which he passed on March 19, 2018. (*Id.* ¶ 24.) It was determined that Plaintiff was eligible for classification/custody reduction, and he was released from maximum custody. (Doc. 72-1 at 6, Pl. Decl. ¶¶ 21–22.) Plaintiff was transferred to a transitional program—Phase IV of the SDP—at a close custody facility for four weeks, after which his status was modified to "completed." (*Id.* ¶¶ 23–24.) Plaintiff was then restored to pre-STG status and permitted, among other benefits, time credits; double cell living; contact food visits; programming; and better medical, food, and recreation. (*Id.* ¶ 25.) Plaintiff was housed at this status, and received the above privileges, for approximately three years, until January 23, 2021, when he was transferred back to maximum custody at the Browning Unit. (*Id.* ¶ 26.)

Plaintiff was in Phase V of the SDP in January 2021. (DSOF ¶ 25.) On January 21, 2021, Plaintiff was disciplined for threatening or intimidating correctional staff. (*Id.* ¶ 26.) On January 23, 2021, Plaintiff was disciplined for possessing a prohibited communication device. (*Id.* ¶ 27.) Plaintiff appealed both disciplinary convictions, and both convictions were upheld. (*Id.* ¶ 28.)

Defendant Young determined that the evidence documented by Plaintiff's disciplinary violations was sufficient to remove Plaintiff from the SDP, and Defendant Regional Operations Director Curran and Investigative Manager Robert Williams agreed

with that recommendation. (*Id.* ¶¶ 30, 31, 32.) Defendant Uehling signed off on the removal on Williams' behalf. (*Id.* ¶ 33.) Defendant Young determined that Plaintiff's behavior presented a security risk at the Kaibab Unit; therefore, before Plaintiff was removed from the SDP, he was transferred to a detention unit for the safety and security of the institution. (*Id.* ¶ 34.)

On January 23, 2021, Plaintiff was removed from Phase V of the SDP without notice or an opportunity to be heard. (PSOF ¶ 93.) Plaintiff's "completed/inactive status was never revoked." (*Id.* ¶ 100.) Plaintiff was returned to maximum custody in the Browning Unit that same day. (Doc. 86-1 at 9, Pl. Decl. ¶ 46.)

In February 2021, Plaintiff initiated an administrative grievance regarding his removal from the SDP without any notice and without a hearing at which to defend against the reasons for revoking his Step-Down status. (Doc. 78-7 at 11–12; PSOF ¶ 117.) Defendant De La Cruz was the Grievance Coordinator at the time and was "fully aware" that Plaintiff had been removed from the SDP without proper notice. (PSOF ¶¶ 118, 119.) Defendant De La Cruz ignored and rejected Plaintiff's grievances. (*Id.* ¶ 120.)

Plaintiff asserts that, on February 11, 2021, he "advised Defendant Lewis that he had not received the prerequisite procedures attending his maximum custody placement under validated confinement." (*Id.* ¶ 98.) Defendant Lewis responded that:

> [H]e knew Plaintiff was not accorded the prerequisites/proper procedures attending his placement. However[, Defendant Lewis] claims he was being instructed by his superiors, and Defendant Uehling to conduct the review/reclass absent proper protocol, because the policy DO 806 was changing and the generally existing procedures [to] which prisoners were entitled to [adequate] notice, [a] hearing, and opportunity to be heard attending validated confinements were no longer being accorded.

(*Id.* ¶ 99.)

Defendants present a "Notice of Hearing and Inmate Rights (Proposed Maximum Custody Placement)" form dated February 13, 2021, with Plaintiff's initials and a check mark indicating that Plaintiff waived his right to the 48-hour notice of hearing; Plaintiff

- 8 -

claims that he never waived the 48-hour notice. (DSOF ¶ 35; Doc. 86-1 at 10, Pl. Decl. ¶ 51; Doc. 78-7 at 7–9; PSOF ¶¶ 7, 8, 101.) The notice form states, in relevant part, that Plaintiff was being recommended for maximum custody "due to his STG validation" and because "he recently received to major infractions." (Doc. 78-7 at 7.) The notice form cites to the case number, charges, and dates of the two disciplinary convictions. (*Id.*) That same day, a hearing was held regarding Plaintiff's proposed placement in maximum custody, and Defendant Lewis presided over the hearing. (*Id.*)

After the hearing, Defendant Lewis recommended that Plaintiff be placed in maximum custody due to his status as a validated STG member and the fact that he had received two major disciplinary violations. (DSOF ¶ 37; Doc. 86-4 at 9.) The form documenting the February 13, 2021, hearing noted that Plaintiff's status as a Step-Down prisoner had been revoked because he received two major violations. (Doc. 78-7 at 6.) Plaintiff was notified of the appeal process, and it was documented that he did not waive his right to appeal the decision. (*Id.*) Defendants Romney, Days, and Flores approved the recommendation. (Doc. 86-4 at 9.)

Plaintiff asserts that, at some point in March 2021, Defendant Lewis and CO IV Erica Altegieri "discuss[ed] the issues with Plaintiff and inform[ed] Plaintiff that they were aware that he was not afforded meaningful process attending validated confinement." (PSOF ¶ 122.) Defendant Lewis and CO IV Altegieri informed Plaintiff that Defendants Uehling and Reyna and the Attorney General's Office had:

> instructed that the DO 806 (STG) policy was changing and in lieu of the changes any prisoners either being considered [for] or placed [in] maximum security under validated confinement would no longer be accorded the generally existing available procedures to include but not limited to: notice of STG validation/revocation, hearings before the STG Validation Hearing Committee . . . or opportunity to challenge validated confinement decisions.

(*Id.* ¶ 123.)

Plaintiff states that, on March 15, 2021, Defendant Uehling pulled Plaintiff out of

- 9 -

his cell and advised Plaintiff that he would not be receiving any revocation notice or hearing based on a new version of DO 806 that would be in effect April 15, 2021. (Doc. 6 at 10.) Although the new policy was not yet in effect, Defendant Uehling told Plaintiff he was authorized to apply the new policy rather than the previous and still existing policy, which required certain procedural safeguards—such as a 10-day notice and a hearing—prior to removal from the SDP. (*Id.*)

Plaintiff appealed his placement in maximum custody. (DSOF ¶ 38.) Defendant Crabtree responded to Plaintiff's appeal and informed Plaintiff that his placement in maximum custody was correct because he was a validated STG member. (*Id.* ¶ 39.)

Ronald Towles, the Deputy Security Operations Administrator, avers that, during litigation of this lawsuit, he determined that Plaintiff "should be provided a hearing pursuant to the version of DO 806 in effect in January 2021 because [Plaintiff] was removed according to the April 2021 version of DO 806 before that version became official." (Doc. 78-1 at 8, Towles Decl. ¶¶ 33, 43.)

In January 2021, the relevant version of DO 806 provided that a prisoner may be removed from Phases IV or V of the Step-Down Program if it is confirmed that the prisoner violated certain listed criteria. (Doc. 78-1 at 25, DO 806 § 11.2.) However, any recommendation for removal had to be forwarded to the Security Operations Administrator with supporting documentation, and the SSU Coordinator had to deliver to the prisoner, at least ten business days prior to a hearing, the Hearing Notification/Step-Down Revocation form to enable the prisoner time to prepare a defense. (*Id.*, DO 806 §§ 11.3, 11.4.) The STG Validation Hearing Committee then had full discretion to determine whether the prisoner was to be removed from the Step-Down Program or returned to an earlier phase in the Program. (*Id.*, DO 806 § 11.6.) Prisoners were permitted to appeal the decision of the STG Validation Hearing Committee. (*Id.*, DO 806 §§ 11.5, 11.9.)

In April 2021, DO 806 was amended to remove any provision providing for notice or a hearing for prisoners removed from the Step-Down Program. The relevant portion of amended DO 806 states:

> Inmates who are removed from the Step-Down Program, due to direct involvement in STG activity or for any reason deemed appropriate by the respective Regional Operations Director, Investigative Manager, or Assistant Director for Prison Operations, during the inmate's placement in the program shall be required to serve a minimum of two years in Maximum Custody before they are eligible to participate in the program.

(DO 806 § 9.2 (effective date April 15, 2021).)[3]

On August 8, 2022, 19 months after he was removed from the SDP, Plaintiff was served with a "Hearing Notification/STG Step-Down Revocation Hearing" form, which informed Plaintiff that he was being removed from the SDP based on three letters discovered in August, September, and November of 2019. (Doc. 72-1 at 75.) The form indicated that a hearing was scheduled for August 24, 2022. (*Id.*)

On August 24, 2022, an STG Revocation hearing was conducted pursuant to the previous version of DO 806—that is, pursuant to the version that had been in effect in January 2021. (DSOF ¶ 52.) Based on the evidence available, the STG Validation Hearing Committee determined there was not sufficient evidence to remove him from the SDP. (*Id.* ¶ 53.)

Prior to the hearing, Plaintiff had renounced and debriefed regarding his STG membership. (*Id.* ¶ 54.) Therefore, Plaintiff was no longer eligible to participate in the SDP because prisoners who successfully debrief are housed in protective custody facilities. (*Id.* ¶ 55.)

Plaintiff was subsequently housed at ASPC-Lewis, Buckley Unit and classified as a close custody prisoner. (*Id.* ¶ 56.) Plaintiff states that he is still "classified as a[n] STG member albeit 'Renounce[d.]' Yet he is still designated as validated, his classification score is still negatively impacted due to the designation and there exist[s] the likel[i]hood of revalidation as a Mexican Mafia member/suspect. (PSOF ¶ 17.) Plaintiff has not been housed in maximum custody since July 23, 2022. (DSOF ¶ 57.) According to ADC online

---

[3] *See* DO 806, Security Threat Groups (STGs), https://corrections.az.gov/sites/default/files/documents/policies/800/0806.pdf (last visited Aug. 31, 2023).

- 11 -

records, Plaintiff was released from ADC custody on March 29, 2023, and is currently on supervised community release.[4]

## IV. Defendant Shinn – Official Capacity Claims

At screening, the Court found that Plaintiff stated Eighth and Fourteenth Amendment official capacity claims against Defendant Shinn[5] based on his alleged implementation of policies that denied due process during the SDP revocation process and resulted in unconstitutional conditions of confinement in the Browning Unit. (Doc. 8 at 11, 12.)

Plaintiff cannot maintain a claim for damages against Defendant Shinn in his official capacity under § 1983 because "a suit against a state official in his or her official capacity is not a suit against the official but . . . against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted) (holding that the Eleventh Amendment protects states from being sued for damages in federal court). By its express terms, § 1983 applies to "person[s]" acting under color of state law, which does not include states. *Hafer v. Melo*, 502 U.S. 21, 26 (1991); *see also Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991) ("[A] state is not a 'person' for purposes of section 1983. Likewise[,] 'arms of the State' such as the Arizona Department of Corrections are not 'persons' under section 1983.") (citation omitted). Therefore, Plaintiff's official capacity claims are limited to prospective relief only.

The record shows that, after Plaintiff completed the SDP in March 2018, he was moved from the maximum custody Browning Unit into a close custody unit. (Doc. 6 ¶¶ 3, 40.) It is undisputed that, on August 24, 2022, a post-deprivation STG Revocation Hearing was held, and the STG Validation Hearing Committee determined there was not sufficient

---

[4] *See* https://corrections.az.gov/inmate-data-search (Search ADC Number 175713) (last visited Sept. 11, 2023).

[5] In January 2023, Defendant Shinn stepped down as ADC Director, and Ryan Thornell was appointed as the new ADC Director. Because summary judgment is being granted to Defendants as to Plaintiff's official capacity claims, the Court will not substitute Director Thornell into this action.

- 12 -

evidence to remove Plaintiff from the SDP. (DSOF ¶¶ 52, 53.) It is also undisputed that Plaintiff received notice of the post-deprivation hearing approximately two weeks prior on August 8, 2022. (Doc. 72-1 at 75.) The unrefuted facts further show that Plaintiff was moved out of maximum custody on July 23, 2022, and he was released from the ADC and placed on supervised community release on March 29, 2023. When a prisoner seeks injunctive relief concerning the facility where he is incarcerated, the prisoner's claims for such relief become moot when he is no longer subjected to those conditions. *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995). Therefore, Plaintiff's claims for injunctive relief against Defendant Shinn in his official capacity relate to past events that occurred at a prison where Plaintiff is no longer housed, and it is not clear what injunctive relief could be fashioned with respect to Plaintiff's claims in light of his transfer out of maximum custody and his recent release from ADC custody. Absent any indication in the record that Plaintiff will be sent back to ADC and reassigned to maximum custody in the foreseeable future, Plaintiff's claims for injunctive relief will be dismissed.[6]

To the extent Plaintiff seeks declaratory relief, the Court must determine what type of declaratory relief is at issue: retrospective declaratory relief would declare that the defendant committed constitutional violations in the past; prospective relief would declare that likely future actions are unconstitutional. *See Nat'l Audubon Society, Inc. v. Davis*, 307 F.3d 835, 847-48 & n. 5 (9th Cir. 2002). The Eleventh Amendment bars claims seeking only retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 71-73 (1985) (Eleventh Amendment barred retrospective declaratory relief against state officials); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) ("suits against an official for prospective relief are generally cognizable, whereas claims for retrospective relief (such as damages) are not").

In his Complaint, Plaintiff seeks a declaratory judgment that Defendants' actions during his initial SDP revocation proceedings violated DO 806 and Plaintiff's due process

---

[6] Count Two only consisted of an Eighth Amendment official capacity claim and will therefore be dismissed entirely.

- 13 -

rights. (Doc. 1 at 8.) Thus, Plaintiff seeks a declaration that Defendants violated his rights in 2021 when they failed to provide him with proper notice prior to his first revocation hearing. However, Plaintiff has since been given a new revocation hearing, in which he received proper notice via a Form 806-10, and Plaintiff has been released from ADCRR. Consequently, the declaratory relief sought by Plaintiff is retrospective in nature, and it is barred by the Eleventh Amendment. Accordingly, Plaintiff's claim for declaratory relief will also be dismissed.

For the foregoing reasons, summary judgment will be granted to Defendants as to Plaintiff's official capacity claims against Defendant Shinn.

## V.     Due Process – Qualified Immunity

Defendants argue that Plaintiff's individual capacity due process claims fail on the merits because Plaintiff's participation in the SDP did not create a liberty interest and because Plaintiff received adequate process before his maximum custody hearing; Defendants also argue that they are entitled to qualified immunity.

### A.     Defendants' Participation

Defendants argue that Defendants Lewis, Days, Romney, Flores, and Crabtree are entitled to summary judgment because they were not involved in any constitutional deprivation. The evidence shows that Defendant Lewis presided over Plaintiff's February 13, 2021, post-deprivation revocation hearing and recommended Plaintiff's reclassification to maximum custody, and Defendants Romney, Flores, and Days approved the recommendation. (Doc. 86-4 at 9.) Plaintiff appealed this decision, specifically citing the lack of pre-deprivation notice and hearing, and Defendant Crabtree upheld the maximum reclassification based on Plaintiff's validation as a member of an STG. (Doc. 78-8 at 3.) Plaintiff contends that Defendants Romney, Days, Flores, and Crabtree each approved Defendant Lewis's improper post-deprivation classification review and their reviews did not comport with due process.

In their Statement of Facts, Defendants do not set forth any specific facts regarding Defendants Lewis, Days, Romney, Flores, and Crabtree in the events described in the

1 record and in the Complaint. Defendants have the initial burden of identifying those
2 portions of the record, together with affidavits, if any, that they believe demonstrate the
3 absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If Defendants fail to
4 meet their initial burden, Plaintiff need not show anything. Defendants failed to produce
5 sufficient evidence regarding Defendants Lewis, Days, Romney, Flores, and Crabtree's
6 participation, and they have not met their initial burden of production. Moreover, as
7 discussed above, the evidence that has been presented concerning these Defendants'
8 actions during Plaintiff's SDP revocation creates a genuine issue of material fact regarding
9 their participation in the alleged constitutional deprivation. Thus, these Defendants are not
10 entitled to summary judgment based on their purported lack of involvement.

### B.  Due Process Violation

#### 1.  Legal Standard

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to analyze a procedural due process claim, the Court engages in a two-step analysis: First, the Court must determine whether the prisoner was deprived of a constitutionally protected liberty or property interest. *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022). Second, the Court must examine whether that deprivation was accompanied by sufficient procedural protections. *Id.* (citing *United States v. 101 Houseco, LLC*, 22 F.4th 843, 851 (9th Cir. 2022)). To determine whether the procedural protections provided are sufficient at the second step, the Court looks to (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest. *Id.* at 1179-80 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

"A liberty interest 'may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.'" *Id.* at 1180 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "The Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement, but such an interest

may 'arise from state policies or regulations.'" *Id.* (quoting *Wilkinson*, 545 U.S. at 221–22; *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("[T]he Due Process Clause [does not] ... protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody.")). However, an interest in avoiding certain conditions of confinement "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472 (1995) (citations omitted).

**2.  Discussion**

In analyzing a due process claim, the Court must first decide whether Plaintiff was entitled to any process, and if so, whether he was denied any constitutionally required procedural safeguard. Liberty interests that entitle a prisoner to due process are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).

The Ninth Circuit's opinion in *Johnson* controls in this case. In *Johnson*, the plaintiff was removed from the SDP and classified to maximum custody. 55 F.4th at 1178. The Ninth Circuit upheld this Court's finding that the plaintiff did not have an independent liberty interest in participating in the SDP. *Id.* at 1201. However, the Ninth Circuit concluded that the plaintiff had a protected liberty interest in avoiding a return to maximum security from close custody. *Id.* at 1197-98. Thus, the Ninth Circuit held that the plaintiff was entitled to constitutionally adequate procedures before he was moved to maximum custody. *Id.* at 1198.

Likewise, in the instant case, the opportunity to participate in the SDP did not create a liberty interest that entitled Plaintiff to due process. Rather, the SDP is voluntarily administered by ADC and allows STG prisoners to be removed from maximum custody by meeting certain requirements. *See Johnson*, 55 F.4th at 1194 ("We disagree that ADC has created a liberty interest in [plaintiff's] participation in the SDP."). Plaintiff's removal from the SDP did not amount to a constitutional violation.

Taking as true Plaintiff's assertion that he was returned to the Browning Unit on January 23, 2021, it is undisputed that Plaintiff did not receive a maximum custody placement hearing before he was returned to maximum custody. Defendants argue that Plaintiff was provided with due process prior to being placed in maximum custody because he was provided notice and a hearing regarding his two disciplinary infractions, which placed him on "on notice that he could be removed from the Step-Down Program as a result of these disciplinary violations." (Doc. 87 at 5.) But "[i]t is well-settled that placement in maximum security segregation units implicates a liberty interest requiring due process protections." *Brummer v. Ryan*, No. CV 18-01146-PHX-DGC (JZB), 2020 WL 888289, at *6 (D. Ariz. Feb. 24, 2020) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005)). For placement in maximum custody, due process is satisfied if the prisoner is given written notice of the factual basis for the placement and an opportunity to be heard. *Wilkinson*, 545 U.S. at 225-27. Defendants' attempt to make a constructive notice argument is not well-taken. Plaintiff's disciplinary hearing was wholly separate from his maximum custody placement; it did not provide him notice of his return to maximum custody or an opportunity to challenge it. A reasonable jury could conclude that Plaintiff did not receive proper due process before he was returned to maximum custody.

### C. Qualified Immunity

Defendants argue that even if Plaintiff's due process rights were violated, they are entitled to qualified immunity as to Plaintiff's claims for money damages.

#### 1. Legal Standard

Government officials enjoy qualified immunity from civil damages unless their

conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). "[T]he contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

### 2. Analysis

Defendants argue that courts have held that giving prisoners the option to renounce and debrief as the sole way out of maximum custody complies with due process, and it was not clearly established at the time Plaintiff's claim arose that due process is required "for an alternative program that allows validated inmates to move out of maximum custody, like Arizona's Step-Down Program." (Doc. 87 at 6.) According to Defendants, "[t]he Ninth Circuit only just held that while there is no liberty interest in being removed from the Step-Down Program there is a liberty interest implicated under the Due Process Clause in returning an inmate to maximum security from close custody after that inmate has been

removed from the Step-Down Program." (*Id.* (citing *Johnson*, 55 F.4th at 1198).) Defendants characterize *Johnson* as a "case of first impression on this issue." (*Id.*)

Defendants' characterization of the right at issue is too narrow. The Ninth Circuit in *Johnson* explicitly defined the right at issue as "avoiding a return to maximum custody from close custody[,]" and the court specifically stated that this right was clearly established at the time Johnson's claims arose in 2018. 55 F.4th 1197. Like Plaintiff, the plaintiff in *Johnson* had attained Phase IV of the Step-Down Program, and he was moved from maximum custody to close custody. *Id.* The Ninth Circuit observed that the plaintiff's liberty interest in avoiding maximum custody was clearly established: "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions." *Id.* (quoting *Wilkinson*, 545 U.S. at 223).

*Johnson* makes clear that the right at issue is the right to avoid the conditions in maximum custody, not the right to avoid maximum custody after a prisoner has been removed from the SDP and close custody, and that right was clearly established in January 2021 when Plaintiff was sent back to maximum custody without notice and a hearing. Defendants' citation of *Brummer* is misplaced because *Brummer* predates *Johnson*.[7] Defendants have not shown they are entitled to qualified immunity, and summary judgment will be denied.

---

[7] In *Brummer*, another division of this Court stated,

> Although it was clearly established at the time Plaintiff's claim arose that the initial decision to place a prisoner in a maximum custody unit created a liberty interest and required notice and a chance to be hear, the Court is not aware of any Supreme Court or Ninth Circuit case law that examines whether a maximum custody prisoner's participation in a program like the SDP [Step-Down Program] creates a liberty interest, and what if any process is due to the prisoner before he is removed from such a program and returned to maximum custody. This Court has previously held an STG- validated prisoner is not entitled to an alternative means to exit maximum custody, such as the SDP, if annual reviews and debriefing/renouncing are available.

*Brummer*, 2020 WL 888289, at *7.

Accordingly,

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 77).

(2) Defendants' Motion for Summary Judgment (Doc. 77) is **granted** in part and **denied** in part. The Motion is **granted** as to Plaintiff's official capacity claims for injunctive relief. The Motion is otherwise **denied**.

(3) Count Two and Plaintiff's official capacity claims are **dismissed with prejudice**.

(4) This action is referred by random lot to Magistrate Judge Camille D. Bibles to conduct a settlement conference on Plaintiff's Fourteenth Amendment claims in Count One against Defendants in their individual capacities.

(5) Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Bibles' chambers at (928) 774-2566 **within 14 days** to schedule a date for the settlement conference.

(6) The parties must file a joint status report **within thirty (30) days** following the settlement conference, if it is not successful, proposing dates to file their joint proposed pretrial order.

Dated this 12th day of September 2023.

Michael T. Liburdi
United States District Judge